## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-646 |
| | ) | |
| ZAP | ) | |
| | ) | |
| Defendant. | ) | |

_____)

## COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF
## AND FOR CIVIL PENALTIES

1.      The United States of America brings this action under the National Traffic and Motor

Vehicle Safety Act of 1966 ("the Safety Act"), as amended and recodified, 49 U.S.C. §§ 30101,

*et seq.*, for declaratory and injunctive relief, and for civil penalties.

2.      ZAP is an importer of the Model Year ("MY") 2008 ZAP Xebra, which is a Chinese-

manufactured, electric three-wheeled vehicle with an enclosed sedan or truck body.  In 2009,

ZAP recalled the vehicles for noncompliance with multiple requirements of Federal Motor

Vehicle Safety Standard ("FMVSS") No. 122 regarding motorcycle brake systems.

3.      For more than three years, ZAP failed to develop and implement a remedy to bring the

vehicles into compliance with minimum requirements for safety.  It also failed to timely and

properly notify the National Highway Traffic Safety Administration ("NHTSA") about its recalls

and was uncooperative and evasive with NHTSA.  Not only did ZAP provide conflicting or

inadequate information to NHTSA about its recalls, but for years, its claims of having developed

an effective repair remedy were proven wrong.  ZAP also repeatedly and blatantly disregarded

its notification obligations under the Safety Act.  A recall cannot be successful unless owners,

purchasers, and dealers are aware of the recall and are accurately informed about when and how

the recalled vehicles can be remedied.  ZAP's recall notices were false, misleading, untimely, or non-existent.  ZAP left owners in the dark for years about the status of the recalls, leaving them to drive unsafe vehicles on the roadways.

4.      In November 2012, NHTSA issued an Order, following notice and a public hearing, requiring ZAP to remedy the recalled vehicles by providing refunds to the owners of such vehicles, and to destroy or permanently disable the vehicles in ZAP's possession.  Indeed, this was the first time NHTSA exercised its statutory authority to compel a manufacturer to comply with its remedy and notification obligations under the Safety Act.  Yet, to date, ZAP still has not complied with that Order.  Noncompliant vehicles remain on the road today, posing an unreasonable risk of accidents.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 49 U.S.C. §§ 30163(a), 30165(a)(1) and (a)(3), and 28 U.S.C. §§ 1331 and 1345.

6.      Venue in this Court is proper under 49 U.S.C. § 30163(c) and 28 U.S.C. § 1391.

## PARTIES

7.      The Plaintiff is the United States of America, acting by and through the Attorney General of the United States, as authorized under 49 U.S.C. § 30163(a).

8.      The Defendant is ZAP, a publicly-owned company incorporated in the State of California.  Upon information and belief, ZAP also does business as ZAP Jonway.  ZAP's corporate headquarters is located at 501 Fourth Street, Santa Rosa, CA 95401.  ZAP is the registered agent in the United States for China Qingqi Group Inc., also known as Qingqi Group Motorcycle Co., Ltd., a Chinese manufacturer of motor vehicles.  Upon information and belief, ZAP sells products through dealers as well as the internet to customers throughout the United States.

**THE SAFETY ACT**

9.      Congress enacted the National Traffic and Motor Vehicle Safety Act of 1966, as

amended and recodified, 49 U.S.C. §§ 30101, *et seq.*, "to reduce traffic accidents and deaths and

injuries resulting from traffic accidents."  49 U.S.C. § 30101.  To achieve that objective, the

Safety Act provides for regulation of motor vehicles and motor vehicle equipment by the

Secretary of Transportation.  49 U.S.C. § 30111.

10.      The Secretary has delegated his authorities under the Safety Act to the Administrator of

NHTSA, 49 C.F.R. §§ 1.95(a), 501.2(a)(1), and NHTSA has promulgated motor vehicle safety

standards.  *See* 49 U.S.C. § 30111(a); 49 C.F.R. Part 571.

**A Manufacturer's Responsibilities to Notify NHTSA, Owners,
Purchasers, and Dealers of the Vehicle's Noncompliance**

11.      Under the Safety Act, a manufacturer of motor vehicles has a duty to ensure that its

vehicles comply with applicable safety standards.  49 U.S.C. §§ 30102(a)(5), 30112.  The Safety

Act also imposes an independent duty on the manufacturer of a motor vehicle to notify NHTSA,

and owners, purchasers, and dealers of the vehicle, if the manufacturer decides in good faith that

the vehicle does not comply with an applicable FMVSS.  49 U.S.C. § 30118(c)(2).  The Act

defines the term "manufacturer" to include importers of motor vehicles or motor vehicle

equipment for resale, such as ZAP.  49 U.S.C. § 30102(a)(5)(B).

12.      A manufacturer of a motor vehicle that "decides in good faith that the vehicle . . . does

not comply with an applicable" FMVSS must notify NHTSA by submitting a Noncompliance

Information Report within five working days after it determines that a noncompliance with a

FMVSS exists.  49 U.S.C. § 30119(c)(2); 49 C.F.R. § 573.6(b).

13.     The manufacturer must also notify "the owners, purchasers, and dealers of the vehicle" of

the noncompliance.  49 U.S.C. § 30118(c); *see also* 49 C.F.R. Part 577.  These notifications

"shall be given within a reasonable time . . . after the manufacturer first decides that a . . .

noncompliance exists."  49 U.S.C. § 30119(c)(2); *see also* 49 C.F.R. § 577.7(a)(1), (c)(1).

14.     Specifically, the manufacturer must send a notification of the noncompliance, by first

class mail, "to each person registered under State law as the owner [of a vehicle] and whose

name and address are reasonably ascertainable by the manufacturer through State records or

other available sources."  49 U.S.C. § 30119(d); *see also* 49 C.F.R. § 577.7(a)(2)(i).  Among

other things, the notification to owners must contain a clear description of the noncompliance, an

evaluation of the risk to motor vehicle safety reasonably related to the noncompliance, the

measures to be taken to obtain a remedy of the noncompliance, and the earliest date on which the

noncompliance will be remedied without charge.  49 U.S.C. § 30119(a).  "If the owner cannot be

reasonably ascertained, the manufacturer shall notify the most recent purchaser known to the

manufacturer."  49 C.F.R. § 577.7(a)(2)(i); *see also* 49 U.S.C. § 30119(d)(1)(B).  If NHTSA

determines that a notification "has not resulted in an adequate number of motor vehicles . . .

being returned for remedy, [it] may order the manufacturer to send a 2d notification."  49 U.S.C.

§ 30119(e); *see also* 49 C.F.R. § 577.10.

15.     As for the manufacturer's notifications to dealers, they must "contain a clear statement

that identifies the notification as being a safety recall notice" and must "include an advisory

stating that it is a violation of Federal law for a dealer to deliver a new motor vehicle . . . covered

by the notification under a sale or lease until the . . . noncompliance is remedied."  49 C.F.R.

§ 577.13(a)-(b); *see also* 49 U.S.C. § 30112(a)(1).

16.     Further, the manufacturer is required to submit to NHTSA "[a] representative copy of all

notices, bulletins, and other communications that relate directly to the . . . noncompliance and are

4

sent to more than one manufacturer, distributor, dealer or purchaser" not later than 5 days after they are initially sent to manufacturers, distributors, dealers, or purchasers.  49 C.F.R. 573.6(c)(10); *see also* 49 C.F.R. § 579.5(b).

17.     NHTSA may conduct a hearing to decide whether a manufacturer has reasonably met the notification requirements.  49 U.S.C. § 30118(e); *see also* 49 C.F.R. § 557.7.  If NHTSA "decides a manufacturer has not reasonably met the notification requirements, [it] shall order the manufacturer to take specified action to meet those requirements and may take any other action authorized" under the Safety Act.  49 U.S.C. § 30118(e); *see also* 49 C.F.R. § 557.8.

**A Manufacturer's Responsibility to Remedy Noncompliant Vehicles**

18.     Once a manufacturer of a motor vehicle determines in good faith that the vehicle does not comply with an applicable FMVSS, it has three options to remedy the noncompliance: (1) repair the vehicle; (2) replace the vehicle with an identical or reasonably equivalent vehicle; or (3) refund the purchase price, less a reasonable allowance for depreciation.  49 U.S.C. § 30120(a)(1).

19.     The manufacturer must file quarterly reports with NHTSA to inform NHTSA of the number of vehicles that have been remedied.  49 C.F.R. § 573.7.

20.      If a manufacturer decides to repair a noncomplying motor vehicle and fails to do so adequately within a reasonable time, the manufacturer shall either replace the vehicle without charge with an identical or reasonably equivalent vehicle; or refund the purchase price, less a reasonable allowance for depreciation.  49 U.S.C. § 30120(c)(1).

21.     As with a manufacturer's notification responsibilities, NHTSA may conduct a hearing to determine whether the manufacturer has reasonably met the remedy requirements, and if not, NHTSA "shall order the manufacturer to take specified actions to meet those requirements and may take other action authorized" under the Safety Act.  49 U.S.C. § 30120(e); 49 C.F.R. § 557.8; *see also* 49 C.F.R. § 557.7.

**The Safety Act's Enforcement and Penalty Provisions**

22.     The Safety Act specifies that the "Attorney General may bring a civil action in a United States district court to enjoin . . . a violation of this chapter or a regulation prescribed or order issued under this chapter."  49 U.S.C. § 30163(a)(1).

23.     The Safety Act also provides for civil penalties against those who violate certain sections of the Act and regulations thereunder, including those relating to the notification and remedy requirements discussed above.  *See* 49 U.S.C. § 30165(a)(1).  A separate violation occurs for each motor vehicle or item of motor vehicle equipment and for each failure or refusal to allow or perform an act required by any of those sections.  *Id.*  The maximum civil penalty is $7,000 for each violation, and $17,350,000 for a related series of violations.  49 C.F.R. § 578.6(a)(1).  The $7,000 maximum was an increase from $6,000, effective December 27, 2012.  *See* Final Rule, 77 Fed. Reg. 70,710, 70,713 (Nov. 27, 2012).

24.     Civil penalties may separately be assessed against those who violate Section 30166 of the Safety Act, which authorizes the Secretary of Transportation to require a manufacturer to make reports to enable the Secretary to decide whether the manufacturer is complying with the Act or regulations thereunder.  49 U.S.C. §§ 30165(a)(3); 30166(e). The maximum daily penalty is $7,000 for each violation, and $17,350,000 for a related series of violations.  49 C.F.R. § 578.6(a)(3).  The $7,000 daily maximum was an increase from $6,000, effective December 27, 2012. *See* Final Rule, 77 Fed. Reg. 70,710, 70,713 (Nov. 27, 2012).

**Federal Motor Vehicle Safety Standard No. 122, Motorcycle Brake Systems**

25.     FMVSS No. 122 specifies minimum standards for motorcycle brake systems.  49 C.F.R. § 571.122, S1.  Its purpose is to "insure safe motorcycle braking performance under normal and emergency conditions."  49 C.F.R. § 571.122, S2.  It applies to three-wheeled vehicles, such as

the MY 2008 ZAP Xebra at issue, because a "motorcycle" is defined as a "motor vehicle with motive power having a seat or saddle for the use of the rider and designed to travel on not more than three wheels in contact with the ground."  *See* 49 C.F.R. § 571.3(b).

26.     FMVSS No. 122 includes a ten-part test known as "brake test sequence and requirements."  49 C.F.R. § 571.122, Table II.  This begins with an instrumentation check, then brake tests, including stopping distance tests, and finally a final inspection for design durability.  *Id*.  The first brake test in the testing sequence is known as the "first effectiveness test."  A vehicle must stop within specified stopping distances in at least one out of six stops to pass the first effectiveness test.  *Id.* S7, S.7.3.1.  The next brake test, known as the second effectiveness stopping distance test, involves application of a burnishing procedure specified by FMVSS No. 122, and requires a vehicle to stop in a shorter distance than the first effectiveness test because the burnishing procedures is intended to improve braking performance by conditioning the vehicle's brakes.  *See* 49 C.F.R. § 571.122, S5.3.  FMVSS No. 122 also contains requirements for master cylinder reservoirs, *id.* S5.1.2.1, master cylinder reservoir labeling, *id.* S5.1.2.2, and the brake failure indicator lamp.  *Id.* S5.1.3.1.  Noncompliance with the minimum safety standards of FMVSS No. 122 could result in limited braking and vehicle crashes.

## FACTUAL BACKGROUND

27.     ZAP imported MY 2008 ZAP Xebra vehicles from China into the United States.  The vehicles were manufactured by a Chinese company, China Qingqi Group Inc., also known as Qingqi Group Motorcycle Co., Ltd.  Each of these vehicles is a motor vehicle within the meaning of 49 U.S.C. §§ 30112(a), 30118, and is a motorcycle within the meaning of 49 C.F.R. § 571.122, S3.

28.     As part of its compliance testing program whereby NHTSA selects test samples from the marketplace and tests them to the minimum requirements of the applicable safety standard,

7

NHTSA purchased a MY 2008 ZAP Xebra and had the vehicle tested in late 2008 for compliance with FMVSS No. 122 by a NHTSA-contracted independent testing laboratory in Ohio, Transportation Research Center, Inc. ("TRC").

29.     The NHTSA-purchased Xebra failed the first and second effectiveness stopping distance tests.  TRC also observed that the brake master cylinder reservoir label was not worded correctly and that the wording was not at the minimum required height.  On April 9, 2009, NHTSA notified ZAP that the MY 2008 ZAP Xebra appeared not to comply with FMVSS No. 122.  *See* 49 C.F.R. § 571.122, S5.2.1, S5.1.2.2, S5.3.

30.     When NHTSA notifies a vehicle's manufacturer that its vehicle did not pass a compliance test, the manufacturer can agree to recall the vehicles or contest the apparent noncompliance.  If the manufacturer does not agree to recall its vehicles, NHTSA may order the manufacturer to conduct a recall by following a particular regulatory process, beginning with publishing in the Federal Register notice of an "initial decision" that the vehicle does not comply with an applicable safety standard.  49 U.S.C. § 30118(a), (b).

**ZAP's Initial Recall Campaigns**

31.     In response to NHTSA's notification of apparent noncompliance, ZAP elected to recall the vehicles.  It filed its first notice of recall of the MY 2008 ZAP Zebra by submitting a Noncompliance Information Report in which it acknowledged noncompliance with the stopping distance requirements of FMVSS No. 122.  Although the Report acknowledged that ZAP had determined the noncompliance with FMVSS No. 122 to exist as of April 27, 2009, the Report was not filed within five working days as required by 49 C.F.R. § 573.6(b), but was instead prepared by ZAP on May 18, 2009, and received by NHTSA on May 26, 2009.  ZAP did not acknowledge the noncompliance with the brake master cylinder reservoir labeling requirements at that time.

32.     On August 21, 2009, based on further observation of the NHTSA-purchased vehicle,

NHTSA notified ZAP that the NHTSA-purchased Xebra also did not have a separate reservoir

for each brake circuit, as required by FMVSS No. 122, S5.1.2.1.

33.     In response, ZAP filed a notice of recall acknowledging noncompliance with the master

cylinder reservoir requirement by filing a separate Noncompliance Information Report, which

was dated September 30, 2009.  ZAP later amended that Report on December 9, 2009.

34.     ZAP initially represented that 738 vehicles were subject to the recalls, but later revised

that number to 691 vehicles.

35.     As to both of these recall campaigns, ZAP did not notify registered vehicle owners, based

on state motor vehicle registration records about them, as required by the Safety Act, 49 U.S.C.

§ 30119(d)(1)(A); *see also* 49 C.F.R. § 577.7(a)(2)(i), despite representing to NHTSA on a

number of occasions that it would do so.  Instead, ZAP used its internal warranty database as the

source of owner contact information.  That database contained the owner contact information for

only about 116 out of the 691 vehicles subject to the recalls.

36.     To the extent ZAP did notify some of the owners of MY 2008 ZAP Xebra of the

noncompliance, it did so well beyond a reasonable amount of time, waiting anywhere from four

to nine months.  Ordinarily, manufacturers mail recall notices to owners within 60 days of

determining that a vehicle is not compliant with an applicable safety standard.

37.     Moreover, ZAP's recall notices for noncompliance with the stopping distance

requirements were false and misleading.  The notices advised vehicle owners to contact a dealer

to arrange to have their vehicles repaired, and stated that instructions for making the repair had

been sent to the dealers, when in fact ZAP had not developed a repair remedy that it planned to

implement.

38.     In October 2011, after NHTSA determined that there was insufficient progress with

ZAP's recalls, NHTSA asked ZAP to renotify owners about the recalls.  ZAP represented in

writing that it would send follow-up notifications for the initial recalls, which notices would have

had to include a statement that identifies them as follow-up to an earlier notification, *see* 49

C.F.R. § 577.10(e)(1), but ZAP never did so either at that time or at any subsequent time.

39.     As for the required notices to dealers, ZAP belatedly provided NHTSA in or around

October 2012 a copy of a notice that ZAP stated that it had sent to dealers three years ago on or

about September 22, 2009 regarding the noncompliance with the stopping distance requirements.

That notice failed to include a clear statement identifying the notice as a safety recall notice.  Nor

did it include an advisory stating that it is a violation of federal law for a dealer to deliver a new

motor vehicle covered by the notice under a sale or lease until the noncompliance is remedied.

Dealers, including ZAP's wholly owned subsidiary, Voltage Vehicles, continued to sell new MY

2008 ZAP Xebras, even though the vehicles had not been repaired.  ZAP did not send recall

notices to its dealers for the noncompliance with the master cylinder reservoir requirement of

FMVSS No. 122.

40.     ZAP also repeatedly failed to submit or to timely submit quarterly reports to NHTSA for

the recalls as required by 49 C.F.R. § 573.7.

### ZAP's Renewed Recall Campaigns

41.     In December 2011, due to a lack of progress in ZAP's 2009 recall campaigns, NHTSA

requested, and ZAP agreed, to renew its recall campaigns.  But ZAP waited approximately five

months to submit a new Noncompliance Information Report (dated May 18, 2012) to NHTSA

for noncompliance with the stopping distance requirements of FMVSS No. 122.  ZAP also

waited yet another two months to submit a new Noncompliance Information Report (dated July

18, 2012) to NHTSA for noncompliance with the master cylinder reservoir requirement of

FMVSS No. 122.  And for months, ZAP did not send notices to owners about the renewed recall campaigns.  It did so only after NHTSA decided to hold a public hearing to determine whether ZAP had met its remedy and notification obligations, and only on the eve of the October 9, 2012 hearing.

42.     ZAP did not send recall notices to its dealers for its renewed recall campaigns.  Although ZAP submitted multiple drafts of a notice to dealers to NHTSA for review, the draft notices did not comply with the requirements for a notice to dealers for reasons including that the notices omitted mention of noncompliance with the master cylinder reservoir requirement.  They also conflicted with the draft owner notice that ZAP submitted to NHTSA for review.  While ZAP's notice to owners indicated that no remedy was available, ZAP's draft notice to dealers claimed that ZAP had developed a repair remedy that would bring the vehicles into compliance.

### ZAP's Failure to Produce a Repair Remedy to Bring the Recalled Vehicles Into Compliance with FMVSS No. 122

43.     In both the initial recall campaigns in 2009 and the renewed recall campaigns in 2012, ZAP never produced a repair remedy to bring the recalled vehicles into full compliance with FMVSS No. 122.

44.     ZAP represented that it had developed a successful repair remedy in 2009 that was over-engineered and not economically feasible, and thus elected not to implement that remedy.  Although ZAP contracted with Wilwood Engineering, Inc. to develop a different repair remedy, ZAP ultimately acknowledged that the remedy it developed based on Wilwood's recommendations did not bring the vehicles into compliance with FMVSS No. 122.

45.     In particular, in April 2010, Wilwood recommended that ZAP make certain modifications to the vehicle.  Between May and December 2010, ZAP purported to repair the NHTSA-owned MY 2008 ZAP Xebra.

46.     During this time, NHTSA further informed ZAP on June 9, 2010 that the NHTSA-owned

vehicle lacked the brake failure indicator lamp required by FMVSS No. 122, S5.1.3.1.  ZAP did

not acknowledge the noncompliance with the failure indicator lamp requirement at that time.

47.     After ZAP returned the NHTSA-owned Xebra to NHTSA, for nearly a year ZAP

continually failed to respond to NHTSA's informal inquiries regarding whether ZAP had

performed the same repair on the NHTSA-owned Xebra as the repair ZAP planned to make to

the recalled vehicles.

48.     Based on Wilwood's recommendations as to how to modify the vehicle, ZAP apparently

sent repair kits to customers as well as attempted to repair those vehicles whose owners were

able to bring them to Santa Rosa, California.  Even had such remedy been effective in fixing the

stopping distance issue—which ultimately proved not to be the case—the remedy was

inadequate.  It was not reasonable to expect owners to ship or bring their vehicles to Santa Rosa,

California.  Nor was the alternative of sending an owner an installation kit reasonable because it

involved an unduly complex process, requiring the person fixing the vehicle to place the vehicle

on a car lift, remove all the wheels, remove and replace the brake reservoirs, remove and replace

the brake pressure sensors, replace the brake lines, replace the brake pads, install a proportioning

valve, rewire brake sensors and floats, and bleed the system of air, among other things.

49.     In November 2011, given ZAP's continued failure to respond to NHTSA's informal

inquiries regarding the repair to the NHTSA-owned Xebra, NHTSA sent a formal information

request to ZAP.  ZAP responded in December 2011 that it was unable to confirm what

modifications were made to the NHTSA-owned vehicle or to vehicles in the field, and that

additional modifications to the vehicles may be necessary to ensure full compliance with

FMVSS No. 122.

50.     In April 2012, after NHTSA sent ZAP a second formal information request, ZAP indicated that it had contracted with KARCO Engineering ("KARCO"), an independent automotive test laboratory, to test a MY 2008 ZAP Xebra that ZAP had allegedly repaired, and that the vehicle had failed FMVSS No. 122 testing on more than one occasion.  ZAP indicated, however, that it had since made further modifications to the Xebra and planned to have KARCO perform further testing by the end of April, 2012.  ZAP delayed sending the allegedly further repaired vehicle back to KARCO, and when it did, the vehicle again failed the stopping distance effectiveness tests.

51.     The repaired vehicle also did not comply with other requirements of FMVSS No. 122. KARCO's test report, which NHTSA obtained through a Special Order, indicated that the lettering on the vehicle's brake failure indicator lamp did not meet the minimum height requirement of three-thirty seconds of an inch, as specified by FMVSS No. 122, S5.1.3.1(d). Additionally, based on information received from KARCO, NHTSA observed that the failure indicator lamp on the repaired vehicle did not have the legend "Brake Failure," and that the reservoir labeling was not permanently affixed and did not include the required wording to only use brake fluid "from a sealed container."  FMVSS No. 122, S5.1.2.2.

52.     Although ZAP informed NHTSA that it would initiate a repurchase campaign if it had not developed a repair remedy by September 30, 2012, ZAP failed to do so, and continued to promise to develop a repair remedy.

### NHTSA's Public Hearing and Order

53.     In light of ZAP's failure to remedy the MY 2008 ZAP Xebra, to demonstrate to NHTSA that it had even developed a repair remedy that would bring the vehicles into compliance with FMVSS No. 122, and to send required notices about the recalls, NHTSA held a public hearing on October 9, 2012.  *See* 49 C.F.R. §§ 557.6, 557.7; Notice of public hearing, 77 Fed.

Reg. 56,703, 56,703-08 (Sept. 13, 2012).  ZAP's Chief Executive Officer attended and spoke at

the hearing and ZAP also submitted written comments.  ZAP did not contend that its vehicles

met the requirements of FMVSS No. 122.  A transcript of the hearing, along with ZAP's written

comments and other documents related to the subject matter of the hearing, is available in the

public docket, Docket No. NHTSA-2012-0133, at www.regulations.gov.  *See* 49 C.F.R. § 557.7.

54.     On November 13, 2012, pursuant to authority delegated by NHTSA's Administrator,

NHTSA's Senior Associate Administrator for Vehicle Safety issued an Order finding that ZAP

had failed to meet the remedy and notification requirements of the Safety Act, and required ZAP

to take specified actions to meet those requirements.  A copy of the Order is attached as Exhibit

A.

55.     NHTSA's Order requires ZAP to remedy the recalled vehicles by refunding each owner

of a MY 2008 ZAP Xebra $3,100, which was the average market value of the MY 2008 ZAP

Xebra at the time of NHTSA's public hearing based on an opinion NHTSA obtained from an

independent motor vehicle valuation expert.  The Order includes specific requirements for ZAP

to implement the remedy and to report to NHTSA, including requirements to (a) send NHTSA a

sworn written report that ZAP will refund each Xebra owner $3,100; (b) submit to NHTSA a

draft letter of the recall notification, and upon approval, send the letter by registered mail to

appropriate recipients; (c) inform NHTSA of the vehicle identification numbers and addresses of

each notification recipient (accounting for all 691 vehicles subject to recall); (d) pay each title

holder who requests a refund $3,100 by cashier's check; (e) mark all vehicle titles in its

possession as "Junk Automobile"; (f) destroy or disable all Xebras in its possession; and (g)

submit reports updating NHTSA of its progress in complying with this Order.  ZAP's first report

was due to NHTSA by November 26, 2012.

56.     ZAP has failed to comply with NHTSA's Order.

## COUNT I

**Failure to Remedy Noncompliant Motor Vehicles In Violation of 49 U.S.C. § 30120**

57.     The United States incorporates by reference the preceding paragraphs 1 through 56.

58.     ZAP is a manufacturer of the MY 2008 ZAP Xebra, which is subject to FMVSS No. 122 under the Safety Act.

59.     As ZAP acknowledged, the MY 2008 ZAP Xebra was noncompliant with FMVSS No. 122, and ZAP initiated recall campaigns to "repair[] the vehicle." *See* 49 U.S.C. § 30120(a)(1)(A).

60.     ZAP failed to repair the MY 2008 ZAP Xebra within a reasonable time to bring the vehicles into compliance with FMVSS No. 122, in violation of the Safety Act.  49 U.S.C. §§ 30120(a), (c).

61.      ZAP also violated the Safety Act by failing to "replace the vehicle with an identical or reasonably equivalent vehicle" or "refund the purchase price, less a reasonable allowance for depreciation" after failing to adequately repair the vehicles within a reasonable time.  49 U.S.C. § 30120(c).

## COUNT II

**Failure to Comply with the Safety Act's Notification Requirements
In Violation of 49 U.S.C. §§ 30118(c), 30119(c), (d)(1), (e) and
49 C.F.R. §§ 573.6**, **573.7**; **577.7, 577.10, 577.13, 579.5**.

62.     The United States incorporates by reference the preceding paragraphs 1 through 61.

63.     For each of ZAP's recall campaigns, it failed to send required notifications to NHTSA, owners, purchasers and/or dealers.

64.     For its initial two recall campaigns in 2009, ZAP failed to send recall notices to owners based on state motor vehicle registration records in violation of 49 U.S.C. §§ 30118(c),

15

30119(d)(1); 49 C.F.R. § 577.7.  Despite NHTSA's request, ZAP also failed to send re-

notification to owners in violation of 49 U.S.C. § 30119(e); 49 C.F.R. § 577.10.

65.     ZAP also failed to send recall notices to dealers for its 2009 recall campaign for

noncompliance with the master cylinder reservoir requirement of FMVSS No. 122 in violation of

49 U.S.C. §§ 30118(c); 49 C.F.R. § 577.13.  Nor did ZAP send recall notices to dealers for its

renewed recall campaigns in 2012, as required by 49 U.S.C. §§ 30118(c); 49 C.F.R. § 577.13.

66.     In addition, ZAP's recall notice to dealers for its initial 2009 recall campaign for

noncompliance with the stopping distance requirements failed to contain required information in

violation of 49 C.F.R. § 577.13.

67.     All of ZAP's recall notices to owners, purchasers, and dealers were untimely, in violation

of 49 U.S.C. §§ 30119(c); 49 C.F.R. § 577.7.

68.     Finally, ZAP's notifications to NHTSA were inadequate in that ZAP (1) failed to timely

notify NHTSA within five working days after a noncompliance with FMVSS No. 122 was

determined to exist, in violation 49 U.S.C. § 30119(c) and 49 C.F.R. § 573.6; (2) repeatedly

failed to submit or timely submit quarterly reports to NHTSA for its recalls, in violation of 49

C.F.R. § 573.7; and (3) failed to timely submit a copy to NHTSA of the recall notices it sent to

dealers for its initial 2009 recall campaign for noncompliance with the stopping distance

requirements of FMVSS No. 122, in violation of 49 C.F.R. §§ 573.6(c)(10) and 579.5.

## COUNT III

### Failure to Comply with NHTSA's Order

69.     The United States incorporates by reference the preceding paragraphs 1 through 68.

70.     ZAP has not complied with NHTSA's Order issued on November 13, 2012 under 49

U.S.C. §§ 30118(e) and 30120(e) and 49 C.F.R. § 557.8, which required ZAP to take specified

actions to meet its recall remedy requirements; to provide notice of the refund remedy to owners, purchasers, and dealers; and to provide information to NHTSA concerning the recall.

## COUNT IV

### Failure to Comply with 49 U.S.C. § 30166(e)

71.     The United States incorporates by reference the preceding paragraphs 1 through 70.

72.     NHTSA's November 13, 2012 Order required various reports authorized under 49 U.S.C. § 30166(e) to enable NHTSA to decide if ZAP was complying with its recall remedy requirements under the Safety Act.  Those required reports included ZAP's written report stating that it will refund each owner $3,100; ZAP's list of the name, address, and vehicle identification number for each owner to whom ZAP mailed a notification; ZAP's list of the name and address of each dealer to whom ZAP mailed a notification; and ZAP's monthly list containing the status of the refund remedy for each MY 2008 ZAP Xebra.  ZAP's first report was due to NHTSA by November 26, 2012.  ZAP did not provide any of the required reports.

### PRAYER FOR RELIEF

WHEREFORE, the United States prays for the following relief:

A.     That the Court enter a declaratory judgment that ZAP violated 49 U.S.C. § 30120(a)(1)(A) by failing to remedy each of the recalled MY 2008 ZAP Xebras, and that ZAP's violation is continuing.

B.     That the Court enters a declaratory judgment that ZAP violated 49 U.S.C. § 30120(c) by failing to repurchase or replace the MY 2008 ZAP Xebras after failing to repair the vehicles adequately within a reasonable time, and that ZAP's violation is continuing.

C.     That the Court enters a declaratory judgment that ZAP violated the notification requirements of the Safety Act by failing to timely and properly send required notifications to NHTSA, owners, purchasers, and dealers with respect to each of its four recall campaigns, in

violation of 49 U.S.C. §§ 30118(c), 30119(c), (d)(1), (e) and 49 C.F.R. §§ 573.6, 573.7; 577.7,

577.10, 577.13, 579.5, and that ZAP's violation is continuing.

D.      That the Court enter a declaratory judgment against ZAP that it failed and continues to

fail to comply with NHTSA's November 13, 2012 Order issued under 49 U.S.C. §§ 30118(e);

30120(e), and 49 C.F.R. § 557.8, which Order required ZAP to take specified actions to meet its

recall remedy requirements; to provide notice of the refund remedy to owners, purchasers, and

dealers; and to provide information to NHTSA about the recall.

E.      That the Court enter a declaratory judgment against ZAP that it violated and continues to

violate 49 U.S.C. § 30166(e) by refusing to comply with the reporting requirements in NHTSA's

Order.

F.      That the Court permanently enjoin ZAP from violating NHTSA's November 13, 2012

Order and order ZAP to comply with NHTSA's Order, including to notify each owner of a MY

2008 ZAP Xebra that ZAP is repurchasing these noncompliant motorcycles and will pay each

owner $3,100 for the vehicle, and to pay $3,100 to each owner who requests a refund for a ZAP

Xebra as required in NHTSA's Order.

G.      That the Court permanently enjoin ZAP from violating the recall remedy and notification

requirements of the Safety Act and regulations in its recalls of the MY 2008 ZAP Xebra.

H.      That the Court enter judgment against ZAP and order ZAP to pay civil penalties to the

United States, under 49 U.S.C. § 30165, in the amount of $6,000 for each violation occurring on

or before December 26, 2012 of the remedy requirements of the Safety Act under 49 U.S.C.

§ 30120(a)(1)(A) and of 49 U.S.C. § 30120(c) with respect to each vehicle subject to the recalls,

and $7,000 for each violation occurring on or after December 27, 2012 of the requirements of 49

U.S.C. § 30120(c) with respect to each vehicle subject to the recalls.

I.      That the Court enter judgment against ZAP and order ZAP to pay civil penalties to the

United States, under 49 U.S.C. § 30165, in the amount of $6,000 for each violation occurring on

or before December 26, 2012 and $7,000 for each violation occurring on or after December 27,

2012 of the notification requirements of 49 U.S.C. §§ 30118(c), 30119(c), (d)(1), (e) and 49

C.F.R. §§ 573.6, 573.7, 577.7, 577.10, 577.13, 579.5.

J.      Because the total amount of civil penalties sought in paragraphs H and I exceed the

statutory maximum for civil penalties for a related series of violations, that the Court order ZAP

to pay the statutory maximum of $17,350,000 in civil penalties.

K.      In addition to those penalties referred to in paragraphs H through J, that the Court enter

judgment and order ZAP to pay civil penalties of up to $6,000 per day for each violation of 49

U.S.C. § 30166(e) from November 26, 2012—the date it was first required under NHTSA's

Order to submit certain reports to NHTSA—through December 26, 2012 and $7,000 per day for

each violation of 49 U.S.C. § 30166(e) from December 27, 2012, by refusing to comply with the

reporting requirements in NHTSA's Order.

L.      That the Court award the United States fees and cost in this action; and

M.      That the Court grant the United States such other relief as the Court deems just and

proper.


Dated:   May 6, 2013

Of counsel:                                          Respectfully Submitted,

JAMES COLE, JR.                                      STUART F. DELERY
Acting General Counsel                               Acting Assistant Attorney General
PAUL M. GEIER
Assistant General Counsel for Litigation             RONALD C. MACHEN, JR.
TIMOTHY H. GOODMAN                                   United States Attorney
Senior Trial Attorney
U.S. Department of Transportation                    ARTHUR R. GOLDBERG
                                                     Assistant Branch Director

O. KEVIN VINCENT
Chief Counsel
LLOYD S. GUERCI
Assistant Chief Counsel
KERRY E. KOLODZIEJ
SARAH E. SORG
Trial Attorneys
U.S. Department of Transportation
National Highway Traffic Safety Administration

/s/  *Jean Lin*

JEAN LIN
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Phone:  (202) 514-3716
Fax:  (202) 616-8470
email:  jean.lin@usdoj.gov

*Counsel for Plaintiff*